**Awilda VILLARINI–GARCIA,
Plaintiff, Appellant,**

v.

**HOSPITAL DEL MAESTRO, INC.,
et al., Defendants, Appellees.**

No. 92–2373.

United States Court of Appeals,
First Circuit.

Heard Aug. 3, 1993.

Decided Nov. 1, 1993.

82

Daniel R. Bright with whom Robert Braunschweig and Braunschweig Rachlis Fishman & Raymond, P.C. were on brief, for plaintiff, appellant.

Jose L. Gandara with whom Ramon E. Bauza Higuera and Raul Davila Rivera were on brief, for defendants, appellees Dr. and Mrs. Mario Tomasini.

Thomas Doran Gelabert with whom Eli B. Arroyo was on brief, for appellee Hosp. Del Maestro, Inc.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

This case is a medical malpractice action arising under Puerto Rico law. On summary judgment, the district court ruled that the claims, brought four years after the event, were barred by the local one-year statute of limitations. In our view, the district court's ruling is correct as to three of the claims; on the remaining claim, we think that it was for the jury rather than the court to determine whether the knowledge and due diligence requisites for bringing the claim at this time have been met.

The facts are largely undisputed. In August 1986, Awilda Villarini Garcia ("Villarini") consulted Dr. Mario Tomasini about a birthmark or mole that Villarini had on her back. Villarini had been referred to Tomasini by Hospital del Maestro at which Tomasini was a surgeon. After examining Villarini, but without doing a biopsy, Tomasini advised Villarini that the mole should be surgically removed because it might turn malignant in the future.

Villarini was concerned that surgery involving her back might affect her career as a concert pianist, and she asked Tomasini whether the proposed operation would impair her ability to practice and perform at the piano. Tomasini assured her that the proposed excision was minor surgery that would pose no risk to Villarini's musical career. The surgery was performed in Puerto Rico on September 8, 1986. During the surgery, Tomasini removed a piece of muscle tissue as well as the mole. No biopsy was performed either before or during the operation. The pathology report showed that nothing removed was cancerous.

After the operation Villarini experienced severe pain. A few weeks after the surgery Villarini received the hospital pathology report and learned for the first time that muscle tissue had been cut out, despite the absence of cancer. She then called Tomasini, advised him that serious pain was continuing and inquired about the removal of the muscle tissue. Tomasini replied that the removal was normal and necessary, that only a small amount had been removed, and that she would suffer no lasting harm and had no reason for concern about her career. Tomasini also said that post-operative pain was to be expected and might last for a year or even more. He said that no further treatment was needed, apart from light exercise.

Villarini's back pain continued, although declining in severity and frequency, through the remainder of 1986, throughout 1987, and during the first half of 1988. By early summer 1988, the back pain had largely disappeared but in June 1988 Villarini experienced a new discomfort involving her arm and apparently a different sort of back pain as well. In July 1988, she visited a chiropractor, Dr. Efrain Palmer, whom Villarini had consulted in previous years for a scoliosis, or spine curvature, condition. She visited Palmer several more times between September 1988 and May 1989. In one of these visits, probably the September 1988 visit, Villarini mentioned her mole-removal surgery and Palmer speculated that the operation might have adversely affected her scoliosis. When Villarini asked whether she should sue Tomasini, Palmer (in his own words) "tried to discourage" this course. In Villarini's recollection, Palmer told her "that there seemed to be no basis or relationship between my current complaint and the surgery."

During the summer of 1988, Villarini felt that her back was well enough to permit her to schedule piano concerts in September 1988 in Puerto Rico and New York. As she began preparing, Villarini experienced severe pain in her arm, and she was forced to cancel the concerts. Between September 1988 and May 1989 Villarini consulted a number of other doctors or other specialists, apart from her visits to Palmer.[1] These doctors, some of

---

1. In September and October of 1988, Villarini consulted Dr. Carlos Berrocol, her family physician who diagnosed her problem as a swollen muscle; Dr. Stanley Weinapel, a member of the Department of Rehabilitation Medicine at St. Luke's–Roosevelt Hospital in New York, who told her that she had "overuse syndrome"; Dr. Edwin Rosario Rios, a physiatrist who concluded that the pain stemmed from calcifications in the shoulder; and Dr. Jose Abreu Deliz, an orthopedic surgeon who seconded the "overuse syndrome" diagnosis. In February and April of 1989, Villarini saw Dr. James Parkes, a New York physician who viewed the pain as arising from calcifications and tendinitis; Dr. Glatter, a physiatrist who concluded that she had scoliosis

whom were aware of the mole removal, gave various diagnoses for her continuing pain. These included "swollen muscle," calcification in the shoulder, "overuse syndrome," tendinitis in the arm, and scoliosis.

On June 29, 1989, Villarini saw Dr. Gary Ostrow, an osteopath. He opined that her back and arm pain were both due to the surgery on her back. Villarini then retained counsel and, just under a year after the Ostrow visit, Villarini brought suit on June 28, 1990, against Tomasini, Hospital del Maestro and various insurers in the federal district court in Puerto Rico. The complaint, seeking $1 million in damages, made essentially four claims of malpractice:

1. failure to secure appropriate consent for the removal of the muscle tissue;

2. negligence in failing to warn Villarini adequately about the risks and consequences of the operation;

3. negligence in choosing unnecessarily to remove the muscle tissue;

4. negligence in failing to provide adequate post-operative care or treatment.

Following discovery, including depositions of Villarini and Palmer, motions for summary judgment were filed by the hospital and by Tomasini. These motions relied upon the one-year statute of limitations in Puerto Rico's Civil Code art. 1868, 31 L.P.R.A. § 5298, which pertinently provides:

The following prescribe in one year ... [a]ctions to demand civil liability ... for obligations arising from ... fault or negligence ... from the time the aggrieved person had knowledge thereof.

The motions were opposed by Villarini who included a detailed affidavit setting forth many of the facts already recited. On October 13, 1992, the district court granted summary judgment for the defendants. After a discussion of the facts and authorities, Judge Cerezo concluded that Villarini had failed to exercise due diligence in pursuing her claims. Given Villarini's state of knowledge as of September 1988, the district court ruled that Villarini was not entitled to wait almost two more years before bringing suit. Accordingly, the court dismissed the complaint.

■ Article 1868, although it prescribes a one-year statute of limitations, has been construed by the Supreme Court of Puerto Rico to incorporate the so-called discovery rule. *See, e.g., Santiago Hodge v. Parke Davis & Co.,* 909 F.2d 628, 632–33 (1st Cir.1990), discussing *Colon Prieto v. Geigel,* 115 D.P.R. 232, 247, 15 Off.Trans. 313 (1984). The one-year period does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit. The classic case for the discovery rule is the sponge, negligently left inside the patient during the operation, whose ill effects are not apparent for several years.

It is easy to state the gist of the discovery rule but more difficult to fine-tune it. Puerto Rico decisions say that the knowledge required to start the statute running is knowledge not only of harm but also of "the origin of the injury," *Geigel,* 115 D.P.R. at 245, 15 Off.Trans. at 329, which we take to include knowledge of the wrong and a causal link between the wrong and some harm. But actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired. 115 D.P.R. at 244–45, 15 Off.Trans. at 327–29. Actual knowledge is a matter of fact, but the concept of due diligence has buried within it a normative question of how much diligence *should* be expected of a reasonable lay person.

■ On review of a grant of summary judgment, disputed issues of fact are resolved in favor of the non-moving party and inferences are drawn in that party's favor. *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Giving Villarini the benefit of this approach, we think that claims 1, 2 and 4 were properly dismissed but that a jury is entitled to decide whether claim 3 was timely brought under the discovery rule applied in Puerto Rico. We consider each of the claims in order.

---

and mild tendinitis; and finally a number of therapists and physicians at Lincoln Medical and Mental Health Center in the Bronx, who told her

the problem stemmed from overuse and administered physical therapy and ultrasound treatments.

**85**

■ 1. The first claim is that Tomasini removed a part of Villarini's body without getting her permission. If the surgeon gets consent to remove a mole on the patient's back but takes out the patient's appendix as well, there is little doubt that the surgeon would face a lawsuit, whether one calls it negligence or battery. Here, no doubt Tomasini will say that the consent he got should be taken to ·include a fragment of muscle tissue, but we are concerned now not with the merits but with the statute of limitations.

From the standpoint of the statute of limitations, Villarini knew three weeks after the operation that a portion of her muscle had been removed without her specific consent; she also knew that she was suffering substantial and unexpected pain stemming from the operation. It seems to us that Villarini knew at this point enough to require her to resort to a lawyer on the lack of consent claim. If the lawyer judged that the consent was deficient, then she had to bring suit within one year after receiving the pathology report and having it confirmed by Tomasini.

The core of the claim, after all, is the lack of consent for the doctor's removal of the muscle tissue, so the alleged malpractice was known to Villarini as soon as she learned that the muscle had been removed. So, too, was the fact that she was suffering pain from the operation beyond anything she had expected. Villarini therefore had knowledge of the critical facts for this claim shortly after the operation, and under Puerto Rico law she could not wait four years to assert it.

■ 2. The failure to warn claim is embraced by the same logic. Villarini knew three weeks after the operation that not only was she suffering unexpected pain but, according to Tomasini himself, that the pain might well continue for over a year. At this point, one might expect a reasonable person to conclude that a warning of such possible consequences should have been given before the operation, especially to one whose career could depend on physical well-being.

As we explain below, Villarini was entitled to rely on Tomasini so far as he predicted that the operation was normal and the pain would come to an end. There thus might be good reason for her to defer any suspicion that the operation had gone awry. But the malpractice claim in question depends on a lack of warning, not bungled surgery; and the duration and effects of the pain following a perhaps inadequate warning might affect the amount of damages but not the existence of damages. Once again, we think that Villarini clearly knew within three weeks all of the facts that justified this claim.

■ Of course, Villarini was not a lawyer and could not know whether technically the lack of warning (or, for that matter, the lack of consent to the muscle removal) constituted malpractice. The discovery rule, however, focuses on whether the plaintiff knew the facts that gave rise to the claim, not their full legal implications. *Osborn v. United States,* 918 F.2d 724, 731 (8th Cir.1990). And where those known facts create a reasonable basis for concern about malpractice, there is nothing unfair in a policy that insists that the plaintiff promptly assert her rights. *Aldahonda–Rivera v. Parke Davis & Co.,* 882 F.2d 590, 593 (1st Cir.1989). After all, the statute of limitations also serves to protect defendants against stale claims, and the discovery rule is designed to accommodate a plaintiff's interests but not to make them trump all others.

■ 3. Villarini's third claim—negligence in removing the muscle fragment without a biopsy—stands on a different footing. At the outset we must make clear that the record reveals nothing about the intrinsic merit of this malpractice claim. We do not know whether it is common, rare, or unthinkable to remove muscle tissue of this amount, in this bodily location, without determining the presence of cancer. Nevertheless, assuming for present purposes that a claim may exist, we think that a reasonable argument can be made on both sides as to whether the statute of limitations debars this claim.

In favor of the district court's view, it is clear that Villarini knew three weeks after the operation that the muscle tissue had been removed without a biopsy and that she was suffering substantial pain; these are two of the crucial facts underlying this claim. Yet she was promptly assured by Tomasini, the very surgeon who had performed the opera-

tion, that the removal of the muscle tissue had been proper and that the pain was normal and would eventually end. As a matter of common sense, and Puerto Rico precedent, *see Geigel*, 315 D.P.R. at 245, 15 Off.Trans. at 329, she was entitled initially to rely on this prognosis from her doctor.

The prognosis was initially borne out because the pain in her back did lessen and largely disappear over the next year and a half. The new pain, which replaced the old, was at least partly in the arm. And while Villarini might be faulted for not specifically asking the doctors after Palmer whether the operation had caused the new pain, at least some of these specialists were aware of the operation but none of the varying diagnoses she received pointed to the operation as a possible cause, until Ostrow did so on June 29, 1989. Arguably Ostrow's appraisal at that time was the first firm knowledge Villarini had of an asserted direct link between the operation and the persistence of pain elsewhere in the body three years after the operation.

In sum we think that a reasonable factfinder, while not necessarily compelled to do so, could find that Villarini did exercise due diligence as to the third claim but did not obtain the necessary knowledge until June 29, 1989. Tomasini's reassurances, while irrelevant to (or actually strengthening) the lack of warning claim, could have lulled a reasonable person into believing for a year or more that the operation had not been botched. And while Villarini had all the information needed to bring the lack of warning claim within a few weeks after the operation, a factfinder could conclude that the final ingredients for the third claim did not fall into place until after the pain persisted and Ostrow gave his opinion.

Of course, a jury might not find all of the facts as we have described them. In particular, more than a year prior to the suit, Palmer did suggest a link between the operation and the continuing pain. Perhaps, as the district court apparently believed, Palmer's withdrawal of this initial suggestion was less firm than Villarini now claims.[2] But under the case law previously cited, Villarini is entitled to the benefit of her version of events in resisting summary judgment. To the extent that factual issues remain, that itself would be a basis for denying summary judgment.

Even if we assume that all of the pertinent facts are known, iron-clad and complete, the third claim still cannot properly be dismissed on summary judgment. Whether or not a case rests on diversity jurisdiction, the summary judgment standard is a matter of federal law, for it is settled that, broadly speaking, in a federal court federal law determines the respective roles of trial judge, jury, and reviewing court. *See generally Molinar v. Western Electric Co.*, 525 F.2d 521, 527 (1st Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976).[3] "*Erie* does not require a federal court to employ the state's rules on the allocation of issues between judge and jury." *McEwen*, 919 F.2d at 60. *See generally Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Under federal case law, "[t]he question whether a plaintiff has exercised reasonable diligence is usually a jury question." *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir.1991). *Accord, Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir.1992). Our circuit took the same view in *Santiago Hodge*, 909 F.2d at 633. This is not surprising since factual disputes are often important in pass-

---

**2.** According to Villarini, Palmer backtracked and said that there seemed to be "no basis or relationship" between the operation and the later pain. Palmer's own recollection was that he told Villarini that causation would be "very difficult to prove" since the new condition was not on the spine and there was a previous history of scoliosis. If there is any disagreement between these versions, it was for the jury to resolve.

**3.** *E.g., Bank of California v. Opie*, 663 F.2d 977, 979 (9th Cir.1981) (federal summary judgment standard controls in diversity case); *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co.*, 709 F.2d 427, 430 n. 3 (6th Cir.1983) (majority of circuits follow federal law on directed verdict standard); *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59 (7th Cir.1990) (federal law controls burden and order of raising issues but not burden of proof in the "risk of nonpersuasion" sense).

ing upon the statute of limitations defense. But even where no raw facts are in dispute, the issues of due diligence and adequate knowledge are still ones for the jury so long as the outcome is within the range where reasonable men and women can differ.

Strictly speaking, due diligence and adequate knowledge in this case may not turn on disputed issues of fact; rather, the outcome may depend only on the application of general standards to known facts. But juries make these normative judgments all the time in negligence cases, and jurors are no less well equipped to decide what a reasonable lay person would and should do when faced with a certain amount of information about a medical problem and the possibility of malpractice. Indeed, one may have more confidence in the jury's ability to decide such a question than to decide whether a complex machine is properly designed, the staple question in products liability litigation. In all events, the case law favoring a jury decision on such "mixed" questions has worn a deep groove.

Accordingly, we conclude that where a reasonable jury could find that the plaintiff lacked knowledge despite due diligence, the statute of limitations issue in a discovery-rule jurisdiction should not be withdrawn from the jury by summary judgment. This is so even though the raw facts are largely undisputed and even though the trial judge—acting as an independent decisionmaker—might reasonably believe that the plaintiff was not diligent.[4] This is a description of the third claim in our case, at least at the present stage. What it will look like after the plaintiff rests is another matter.

■ 4. The fourth claim concerns Tomasini's alleged failure to provide proper treatment for Villarini after the operation. There is no indication in the complaint, Villarini's opposition to summary judgment, or briefs in this court of the facts comprising this claim: what treatment was omitted, how the omission affected Villarini, or when she learned of the pertinent facts to support this claim.

We conclude that the grant of summary judgment must be sustained as to this claim. Villarini was in Tomasini's care only for a limited period after the operation; there is no indication that Tomasini's role continued into 1988 or 1989. Accordingly, his supposed omissions or improprieties in post-operative treatment occurred well over a year before this suit was brought. It was Villarini's responsibility in opposing summary judgment to assert facts that (if proved at trial) would allow a jury to find that the discovery rule requirements were met, specifically, a lack of knowledge despite an exercise of due diligence.[5]

No such facts were asserted in the district court by Villarini to show lack of knowledge despite due diligence. Indeed, even in this court Villarini's brief does not separately address the treatment claim, describe the underlying misconduct or give any reason to think that the discovery rule applies to this claim, brought four years after the underlying events. Since we do not normally consider claims on appeal that are not substantially argued in the briefs, this claim may be lost twice over.

The judgment of the district court is *affirmed* as to the consent, failure to warn and post-operative treatment claims. As for the claim based on removal of the muscle without a biopsy, the judgment is *vacated* and the case *remanded* for further proceedings consistent with this opinion. No costs.

---

4. See *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987) (on summary judgment, there is no room "for the measured weighing of conflicting evidence ... [or] for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)").

5. See *Fragoso v. Lopez*, 991 F.2d 878, 887 (1st Cir.1993) (burden of proof to show lack of knowledge is on the plaintiff who sues more than one year after the event); *Hodge v. Parke Davis & Co.*, 833 F.2d 6, 7 (1st Cir.1987) (same), citing *Illuminada Rivera Encarnacion v. Estado Libre Asociado de Puerto Rico*, 113 D.P.R. 383, 385, 13 Off.Trans. 498, 501 (1982).