UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-2149

EDNA RODRIGUEZ-SURIS, ET AL.,

Plaintiffs - Appellants,

v.

BERTHA MONTESINOS, ET AL.,

Defendants - Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Dominguez, U.S. District Judge]



Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Keeton, District Judge.



Kevin G. Little for appellants.
Joe  W.  Redden,  Jr., with whom Curt  Webb, Linda  K.  McCloud,
Beck, Redden & Secrest ,  Edna Hernandez and  Reichard & Escalera were
on brief for appellees.



August 11, 1997


Of the District of Massachusetts, sitting by designation.

KEETON, District  Judge. In this diversity action,

plaintiffs-appellants sued defendants-appellees for injuries

sustained after receiving facial collagen injections from defendant

Bertha Montesinos. Plaintiffs filed their complaint nearly four

years after receiving the injurious injections. The district court

granted summary judgment in favor of both defendants (Montesinos

and Collagen Corporation), holding that all of plaintiffs' claims

were barred by the one-year Puerto Rico statute of limitation

applicable to tort actions. 935 F. Supp. 71 (D.P.R. 1996). We

reverse and remand with directions, as explained.

I. Issues Presented

The principal legal issues in dispute in this case

concern limitation of tort actions under the law of Puerto Rico.

More precisely, the dispute centers on the meaning of statutory

provisions and opinions of courts of Puerto Rico interpreting them,

particularly with respect to levels of awareness of injury, source

of injury, causal connection, and legal responsibility.

To what extent is the running of the statutory time limit

of one year for the filing of tort actions for damages affected by

lack of awareness of injury, a connection between injury and the

personal services or other conduct of a person, and legal

responsibility for the injury?

To what extent is the running of the statutory time limit

of one year affected by lack of awareness of a connection between

-2-

injury and a product of a manufacturer or other supplier of the

product?

To what extent is the running of the limitation period

affected by the representations of the person who caused the

injury, or of third persons, regarding the nature and source of a

plaintiff's injury?

Answers to these questions must be determined as matters

of law. Accordingly, this court reviews the district court's

rulings on these issues de novo.

The matters of law we are deciding, of course, are

matters of the law of Puerto Rico. Both in the district court and

in this court on appeal, the determination of these questions of

law does not involve any discretion to fashion rules of law.

Instead, our objective is solely to determine what is the law as

indicated by authoritative sources. Primary among these

"authoritative sources" are the plainly expressed holdings of the

highest court of Puerto Rico. See, e.g., Daigle v. Maine  Med.

Ctr.,  Inc., 14 F.3d 684, 689 (1st Cir. 1994) (noting that in

applying state law, a federal court is "absolutely bound by a

current interpretation of that law formulated by the state's

highest tribunal"). Where a jurisdiction's highest court has not

spoken on a precise issue of law, we look to "analogous state court

decisions, persuasive adjudications by courts of sister states,

learned treatises, and public policy considerations identified in

state decisional law" in order to make an "informed prophecy" of

-3-

how the state court would rule on the precise issue. Blinzler v.

Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996).

II. Puerto Rico Law Regarding the Statute of Limitation

A. An Overview

The Puerto Rico statute of limitation for tort actions

provides for a one-year limitation period that begins to run from

"the time the aggrieved person has knowledge of the injury." P.R.

Laws Ann. tit. 31, S 5298 (1994). Plaintiff bears the burden of

proving when the "damage" became known. Rivera  Encarnacion v.

Comm. of Puerto Rico , 113 P.R. Dec. 383, 385, 13 P.R. Offic. Trans.

498, 501 (1982).

What is it that one must know in order to have "knowledge

of the injury?" The Supreme Court of Puerto Rico has stated that

a plaintiff will be deemed to have "knowledge" of the injury, for

purposes of the statute of limitation, when she has "notice of the

injury, plus notice of the person who caused it." Colon Prieto v.

Geigel, 115 P.R. Dec. 232, (1984), 15 P.R. Offic. Trans. 313,

330 [citations hereafter to P.R. Offic. Trans.]. See also  Fragoso

v. Lopez, 991 F.2d 878, 886 (1st Cir. 1993); Santiago  Hodge v.

Parke Davis & Co. , 909 F.2d 628, 632 (1st Cir. 1990);  Barretto Peat

v. Luis  Ayala  Colon  Sucrs., 896 F.2d 656, 658 (1st Cir. 1990);

Hodge v. Parke Davis & Co., 833 F.2d 6, 7 (1st Cir. 1987).

"Notice of the injury," as explained in a later case, is

established by proof of:

some outward or physical signs through
which the aggrieved party may become aware

-4-

and realize that he [or she] has suffered
an injurious aftereffect, which when known
becomes a damage even if at the time its
full scope and extent cannot be weighed.
These circumstances need not be known in
order to argue that the damage has become
known, because its scope, extent and
weight may be established later on during
the prosecution of the remedial action.

Delgado Rodriguez v.  Nazario de Ferrer , No. CE-86-417, slip op. at

10 (Official English Translation) (P.R. May 16, 1988) (quoting H.

Brau del Toro,  Los Danos y Perjuicios Extracontractuales en Puerto

Rico 639-40, Pub. J.T.S., Inc. (2d ed. 1986)) (internal quotation

marks omitted). Once a plaintiff is on "notice of the injury," the

plaintiff may "not wait for his [or her] injury to reach its final

degree of development and postpone the running of the period of

limitation according to his [or her] subjective appraisal and

judgment." Ortiz v. Municipality of Orocovis, 113 P.R. Dec. 484,

487, 13 P.R. Offic. Trans. 619, 622 (1982).

In some circumstances, awareness of the existence of an

injury, on its own, will not be enough to trigger the running of

the limitation period. See,  e.g.,  Galarza v.  Zagury, 739 F.2d 20,

24 (1st Cir. 1984) (stating that "knowledge of the author of the

harm means more than an awareness of some ill effects resulting

from an operation by a particular doctor"). If a plaintiff is not

aware of some level of reasonable likelihood of legal liability on

the part of the person or entity that caused the injury, the

statute of limitation will be tolled. In other words, a plaintiff

must also have "knowledge of the author of the injury," a concept

-5-

articulated at length in the Supreme Court of Puerto Rico's

decision in Colon Prieto. 

In Colon  Prieto, the plaintiff experienced pain and

insensitivity in his tongue following dental surgery in November

1971. 15 P.R. Offic. Trans. at 317. Geigel, the dental surgeon,

told plaintiff that he had bitten himself on the tongue and that

the symptoms would subside in a short while.  Id. For over a year,

Colon Prieto continued to see Geigel, who told him that the pain

would go away. Id. But the symptoms did not subside. In November

1972, plaintiff consulted with another physician, and learned for

the first time that the pain was the result of Geigel's having cut

a nerve during the initial operation.

Colon Prieto brought suit against Geigel on September 10,

1973, more than one year after the original operation. Geigel

asserted the statute of limitation as a defense. The Supreme Court

of Puerto Rico rejected Geigel's defense, holding that, because

Colon Prieto did not acquire knowledge of the nature of his injury

and Geigel's role in the injury until the November 1972

consultation with the other doctor, plaintiff was not barred under

the Puerto Rico statute of limitation.

Distinguishing Colon Prieto's case from the more

traditional tort case in which a plaintiff is aware from the moment

of the tortious act of the injury and its cause (for example, where

a defendant's act causes something to fall on a plaintiff

immediately), the Supreme Court of Puerto Rico observed that the

statutory phrase "' from the time the aggrieved person had knowledge

-6-

thereof' ... rejects a literal and narrow reading." Id. at 327.

The court noted that the legal reasoning behind a plaintiff's loss

of rights under a statute of limitation is that the plaintiff is

deemed to have abandoned those rights. Id. (quoting A. Borrell

Macia,  Responsabilidades Derivadas de Culpa Extracontractual Civil ,

66, Barcelona, Ed. Bosch (2d ed. 1958)). In order for this legal

reasoning to apply, therefore, "such abandonment [on the part of

the plaintiff] should really exist." Id.

B. Three Analytically Separable Questions

We conclude that within the larger structure regarding

the law of Puerto Rico on limitation of tort actions are three

analytically separable subsidiary issues. These issues concern the

circumstances in which a plaintiff can be said to have, or to lack,

the requisite level of awareness for statute of limitation

purposes.

First, the concept of "true knowledge" applies where a

plaintiff is actually aware of all the necessary facts and the

existence of a likelihood of a legal cause of action. Second,

concepts of "notice" and "deemed knowledge" apply. Under these

concepts a plaintiff's subjective awareness is measured against the

level of awareness that the plaintiff, having been put on notice as

to certain facts and having exercised reasonable care regarding a

potential claim, should have acquired. Third, the law or Puerto

Rico recognizes an exception to applicability of the concepts of

notice and deemed knowledge for circumstances in which a

-7-

plaintiff's failure to make a timely filing of a claim is

reasonably based upon the assurances of the person who caused the

injury.

From a structural perspective, two of these questions

(about true knowledge and deemed knowledge) concern alternative

ways in which a defendant may establish that a claim is barred

because it is filed too late. If the defendant succeeds in showing

that plaintiff has not satisfied, or cannot satisfy, plaintiff's

burden of proving lack of true knowledge (that is, lack of full

awareness of all that need be known to preclude tolling), final

judgment for the defendant on the ground of late filing is

appropriate.

If, instead, the finder of fact finds (or the court, by

determining that the evidence of record is so one-sided as to

compel a finding) that the plaintiff was aware of enough facts to

constitute notice and to satisfy the deemed knowledge rule of the

Puerto Rico law of limitation of tort actions, final judgment for

the defendant on the ground of late filing is appropriate unless

plaintiff has proffered evidence sufficient to support a finding

that representations and assurances by the defendant persuaded

plaintiff to rely reasonably and delay institution of a civil

action.

The "unless" clause in the next preceding sentence may be

treated either as a condition to be satisfied before the deemed

knowledge rule applies, or as a negation of an otherwise adequate

showing of applicability of the deemed knowledge rule. Under

-8-

either analytic treatment of the substantive requirement of the

legal test for deemed knowledge, this substantive requirement is

the third of the analytically separable issues to which we referred

above. It creates another possibility of a plaintiff's showing

that a genuine dispute of material fact precludes a judgment as a

matter of law for the defendant on the limitation ground.

1. Full Awareness:  A Subjective Component of the Legal
Test

In circumstances where a plaintiff has not abandoned a

cause of action, but instead was never aware that such a cause of

action existed, the statute of limitation would not operate as a

bar to the exercise of the plaintiff's legal rights. See Colon

Prieto, 15 P.R. Offic. Trans. at 327-328. As the court noted in

Colon  Prieto, a plaintiff who is not aware of the existence of a

cause of action is essentially incapable of bringing suit within

the limitation period. Id. at 327. The emphasis on the

plaintiff's "subjective" ability to bring suit is justified, at

least in part, by the brevity of the limitation period. Id. at

328.

Reasoning from these premises, the Supreme Court of

Puerto Rico held that, in order for the limitation period to start

to run, a plaintiff must be able to institute suit, which requires

knowledge of the existence of an injury and knowledge of the person

who caused the injury. Knowledge of who caused the injury, the

court held, was necessary so that the plaintiff would know whom to

sue. Id. at 330 (quoting I A. Barrell y Soler, Derecho  Civil

Espanol 500, Barcelona, Ed. Bosch (1955)). 

-9-

In setting forth this standard, the court in  Colon Prieto

stated that it was adopting a "subjective" standard. Id. at 328.

In the law of Puerto Rico, a legal test of this kind is sometimes

referred to as grounded in the "cognitive" theory of damages.  See,

e.g., Barretto Peat, 896 F.2d at 657 (describing S 5298 of Puerto

Rico's Civil Code as codifying the cognitive theory).

To understand this component of the applicable legal

test, for the purpose of applying it to the case now before us, we

must understand what level of awareness is required as to

particulars of the injury and its source. Was the source in

personal services, or in some other form of conduct of some

identifiable person, or in a product used or supplied by some

person and obtained through a chain of distribution involving one

or more others, including a manufacturer?

Under the law of Puerto Rico, the plaintiff's level of

awareness about these matters may be relevant in more than a single

way, bearing upon more than a single sub-issue.

First. What effect is to be given to evidence, if

creditworthy, of the effect that post-injury conduct of a person

who was a cause of the injury, or post-injury conduct of other

persons, had on plaintiff's refraining from or delaying instituting

suit?

Second. What more would the plaintiff have learned about

the injury and authorship of the injury if the plaintiff, having

notice in the sense of awareness of some facts, had then made the

inquiries that a careful person would have made?

-10-

2. Notice and Deemed Knowledge:  The Objective Component

We understand the court in Colon  Prieto to have been

speaking quite explicitly to the second of these two questions

(stated immediately above) in the passage of the opinion noting

that, if a plaintiff's ignorance of an injury and its origin was

due to the plaintiff's own negligence or lack of care, then the

statute of limitation would not be tolled. See Colon  Prieto, 15

P.R. Offic. Trans. at 327-29 (quoting A. Borrell Macia,

Responsabilidades Derivadas de Culpa Extracontractual Civil 344-345

(Bosch ed. 2d ed. 1958)). This point is associated with the level

of awareness implicit in the concept of notice. 

The law of Puerto Rico treats a person as being aware of

all that, having awareness constituting notice, that person would

have been likely to come to know through the exercise of care.

Thus, we understand the holdings of Puerto Rico decisions to mean

that "actual knowledge is not required where, by due diligence,

such knowledge would likely have been acquired." Villarini-Garcia

v. Hospital del Maestro, Inc., 8 F.3d 81, 84 (1st Cir. 1993). It

follows, then, that to determine the point at which a plaintiff

should be held responsible for the required level of awareness of

whether another particular person was an author of the injury, a

court looks to "whether plaintiff knew or with the degree of

diligence required by law would have known whom to sue."  Kaiser v.

Armstrong  World  Indus., 872 F.2d 512, 516 (1st Cir. 1989)

(citations and internal quotation omitted). 

-11-

Once a plaintiff is made aware of facts sufficient to put

her on notice that she has a potential tort claim, she must pursue

that claim with reasonable diligence, or risk being held to have

relinquished her right to pursue it later, after the limitation

period has run. See, e.g., Villarini, 8 F.3d at 85.

In Villarini, a plaintiff was made aware of facts

sufficient for her to be able to file suit (as to two of her

claims) three weeks after her operation. We held that the

plaintiff was time-barred from bringing those claims roughly two

and a half years later. Id. We recognized in Villarini that the

plaintiff may not have understood fully the legal significance of

the facts known to her after her operation, but also recognized

that the meaning of authoritative declarations of the law of Puerto

Rico is that "there is nothing unfair in a policy that insists that

the plaintiff promptly assert her rights." Id. Thus, plaintiff's

failure to consult with a lawyer or otherwise investigate the claim

to which she had been alerted by the factual circumstances

associated with the operation barred her from commencing that claim

in the courts over one year after being on notice. Id.

Similarly, once a plaintiff is put on notice that someone

or some entity is the cause of the injury, the plaintiff may not

succeed in a late-filed claim by asserting ignorance about the

precise identity of the tortfeasor. Also, because corporate

identities and intracorporate relationships are a matter of public

record, knowledge of the precise corporate identity of the entity

responsible for a plaintiff's injury is not required before the

-12-

period prescribed by the statute of limitation begins to run. See

Hodge v. Parke Davis & Co., 833 F.2d 6, 7-8 (1st Cir. 1987).

3. An Exception to the Rule of Notice

An exception to the rule of notice (the objective

component of the law of limitation of tort actions) is recognized.

If a plaintiff's suspicions that she may have been the victim of a

tort are assuaged by assurances made by the person who caused the

injury, a plaintiff will not be held responsible for failing to

pursue her claim more aggressively. Colon Prieto, 15 P.R. Offic.

Trans. at 329-330.

In addition to holdings discussed above (in explanation

of both the subjective and the objective components of the law of

Puerto Rico), the court in Colon  Prieto held that, where the

plaintiff's doctor (the person responsible for causing the injury)

assured the plaintiff that the pain was normal and was due to

plaintiff's biting his tongue during the operation, the plaintiff

would not be held to have "known" of the injury and the cause until

the later consultation. This ruling, the court observed, was

the fairest and most equitable. We
safeguard the aggrieved party's right to
seek redress, while we abstain from
rewarding the person who, having caused
the damage, took refuge in his patient's
trust and ignorance trying to avail
himself of the circumstances in order to
defeat the action.

Id. at 330. 

In this context, where a diligent plaintiff reasonably

relies upon representations made by a tortfeasor that her symptoms

are not the result of a negligent or otherwise tortious act, that

-13-

plaintiff is not barred, because of her "own negligence or lack of

care," from the benefit of tolling of the limitation period. See

Colon  Prieto, 15 P.R. Offic. Trans. at 329-330. See  also

Villarini, 8 F.3d at 85-86. Stated another way, the condition

attached to a plaintiff's right of tolling -- the condition that

she act with care to make additional inquiries once she is on

notice -- does not apply (or is excused, or negated) when the

plaintiff reasonably relies on what others told her. The reliance,

however, must be reasonable, and the determination of the

reasonableness of a plaintiff's reliance on the assurances of

others involves an evaluation that, depending upon the

circumstances, may or may not be a question for the finder of fact,

and thus may or may not preclude summary judgment. See  id. at 86-

87.

Where facts sufficient to support every element of a

claim relating to an injury are apparent to a plaintiff at an

earlier time, it will not be reasonable for the plaintiff to rely

on assurances of a tortfeasor and fail to pursue the claim. See

id. at 86 (where plaintiff had all the information necessary for

a failure-to-warn claim, doctor's subsequent reassurances would not

excuse plaintiff's lack of diligence in pursuing the claim). Our

holdings, moreover, support the conclusion that a time will come at

which, if the tortfeasor's initial predictions are not borne out,

a plaintiff's reliance is no longer reasonable. Id. Finally,

representations made by third-party doctors constitute another

factor to consider in determining whether a plaintiff's continued

-14-

reliance upon the reassurances of a tortfeasor is reasonable. See

Villarini, 8 F.3d at 86 (holding that varying diagnoses of

different doctors, along with the reassurances of the negligent

physician, "could have lulled a reasonable person into believing

for a year or more that the operation had not been botched"). 

C. Summary

In sum, we conclude (1) that within the larger questions

regarding the law of Puerto Rico on limitation of tort actions are

three analytically separable subsidiary questions; (2) that from a

structural perspective, two of these questions (about true

knowledge and deemed knowledge) concern alternative ways a

defendant may establish that a claim is barred because filed too

late; (3) that, if on the evidence proffered in a case, a finder of

fact might reasonably find that representations and assurances

persuaded plaintiff to rely reasonably and delay institution of a

civil action, summary judgment for defendants would be

inappropriate; and (4) that this remains true even if the record

would otherwise require judgment for defendant under the rule of

notice and deemed knowledge.

III. Record for Review

A. Factual Background

Collagen is a natural protein found throughout the body

that provides support to other bodily tissues, including the skin.

Since the 1970s, collagen obtained from animals has been used in a

-15-

variety of medical procedures, including procedures designed to

improve the consistency and appearance of the skin. Defendant

Collagen Corporation manufactures and distributes at least two

types of bovine collagen (derived from cows), called Zyderm and

Zyplast. Both can be injected under the skin to improve the

appearance and structure of the skin. Collagen's products are

distributed only to be sold to and administered by licensed

physicians.

In 1989, each of the plaintiffs, Edna Rodriguez-Suris

("Rodriguez"), Maria Rosa Gonzalez San Juan de Cortes ("Gonzalez"),

Annette Perez de Pedreira ("Pedreira"), and Vanessa Perez de

Fernandez ("Fernandez"), received collagen injections from

defendant Bertha Montesinos. Montesinos, who was not a licensed

physician, obtained injectable collagen from a doctor in Miami,

Florida, and administered the injections at her apartment in

Santurce, Puerto Rico. In each instance, Montesinos injected

collagen into the forehead (between the eyebrows) and along the

"expression lines" surrounding the nose and lips of each of the

plaintiffs. None of the plaintiffs saw the material that was

injected. In some instances, Montesinos provided the plaintiff

with a brochure describing cosmetic collagen treatments, but none

of the plaintiffs saw Collagen Corporation product packaging or

inserts. In the fall of 1989, Montesinos gave each of the

plaintiffs a treatment involving injections. Shortly thereafter,

each plaintiff developed hard red nodules or bumps at the sites of

the injections.

-16-

In the following summary of the evidence of record with

respect to each plaintiff's history of treatment and consequences,

we state the evidence as a finder of fact might find by a

preponderance of the evidence, where any genuine dispute exists,

since our purpose is to determine whether summary judgment for

defendants is appropriate.

1. Rodriguez

Plaintiff Rodriguez went to Montesinos for injections for

the third time in November 1989. Immediately after the treatment,

Rodriguez developed a redness, accompanied by a burning sensation,

around the area of the injections. Although the burning sensation

subsided within a week, Rodriguez was left with a "red, raised

ridge" on both sides of her nose and mouth. Over the next two and

a half years, Rodriguez received three to four more collagen

injections from Montesinos, who assured her that the marks would

gradually go away. The ridge, however, remained hard and did not

diminish in size. Rodriguez last saw Montesinos in March 1992.

Rodriguez spoke informally with two doctors about her

problem. In late November 1989, Rodriguez talked with Dr. Robert

Nevarez, a plastic surgeon, during a party they were both

attending. Rodriguez told Dr. Nevarez that she had received

collagen injections and that the red marks were a reaction to the

injections. Dr. Nevarez said that he thought that the marks were

an adverse reaction to collagen, but that they would go away.

Nevarez told Rodriguez to come to his office for a consultation,

but the plaintiff never followed up. At another social event some

-17-

time between 1989 and 1992, but closer to 1989, Rodriguez talked

with Dr. Pedro Borras, a neurosurgeon, who told her that if the

marks were a reaction to collagen, then they would go away. 

In September 1992, Rodriguez went to see Dr. Tolbert

Wilkinson in San Antonio, Texas, at which time, according to

Rodriguez, she first learned that the marks had been caused by

products of defendant Collagen Corporation and would be permanent.

2. Fernandez

Plaintiff Fernandez, sister of plaintiff Pedreira,

received her third collagen injection treatment from Montesinos in

October 1989. Fernandez did not see what was injected into her

face. The evening after her third treatment, Fernandez noticed

"slightly raised and red" marks in the places where she had been

injected. When the marks did not disappear as she expected,

Fernandez went to see Dr. David Latoni-Cabanillas, a dermatologist,

in early 1990. Fernandez told Dr. Latoni that she received

collagen injections from Montesinos in the areas where she

developed the marks. Dr. Latoni said that the marks looked

"strange" to him, and that he did not know if they would go away.

Dr. Latoni attempted to treat Fernandez' symptoms with

various techniques, including injections of other material and

dermabrasion. His attempts to remedy her symptoms were

unsuccessful. Fernandez also had a discussion with Montesinos, who

told plaintiff that the marks would go away. 

In September 1992, Fernandez consulted with Dr. Wilkinson

in San Antonio. Fernandez claims that she was not aware of the

-18-

source and extent of her injuries until the meeting with

Dr. Wilkinson.

3. Gonzalez

Plaintiff Gonzalez received two treatments from

Montesinos in 1989 and two or three in 1990 or 1991. Gonzalez did

not see the material injected into her face, or any packaging, but

Montesinos told her that it was "animal collagen." Gonzalez

received her second series of collagen injections on October 24,

1989. The day after this second series, Gonzalez developed a rash-

like reaction at the sites of the injections. 

A few months after the development of the rash, Gonzalez

consulted Dr. Isabel Banuchi, a dermatologist who administered

collagen injections as part of her practice. Dr. Banuchi expressed

concern after hearing that Gonzalez had received injections from an

unlicensed person. Dr. Banuchi told Gonzalez that she did not know

whether the material that had been injected was in fact collagen,

and that she had never seen the type of reaction to collagen that

Gonzalez was experiencing.

Gonzalez also consulted with two other doctors between

1990 and 1992: Dr. Carranza, who told her that she should wait and

see what happened with the reaction, and Dr. Armando Silva, a

dermatologist who said he did not know what had been injected into

Gonzalez' face. According to Gonzalez, although she informed all

of these doctors that she developed the symptoms immediately after

being injected by what she was told was collagen, the physicians

said that her reaction seemed "strange" to them, because reactions

-19-

to collagen injections normally disappear. Dr. Carranza, however,

did tell Gonzalez that her rash was a result of whatever had been

injected into her face.

Despite directions from the physicians with whom she

consulted not to have any more injections, Gonzalez received more

treatments from Montesinos two or three times after developing the

rash, in 1990 or 1991. Montesinos administered injections at the

site of the hard nodules because, she told Gonzalez, the reaction

might have been the result of "dead" collagen, and further

injections could help improve the condition of her facial skin.

Gonzalez also sought diagnosis and treatment from

Dr. Walter Benavent. On December 26, 1990, Dr. Benavent wrote to

a scientist at Collagen Corporation asking for assistance in

diagnosing one of his patients (Gonzalez) who had developed

"hardened nodules along both naso-labial folds, corner of the

mouth, and chin following injections of Collagen" some time in

September or October of 1989. According to Dr. Benavent, Gonzalez

stated that the person who administered the injections told her it

was collagen, but that Gonzalez suspected that the collagen might

not have been properly refrigerated because of power outages in

Puerto Rico following Hurricane Hugo. 

Over a year later, in January 1992, Dr. Benavent received

a letter from Collagen Corporation stating that it was difficult to

determine whether his patients (by this time, Gonzalez and

Pedreira) had in fact been injected with collagen, because their

described symptoms were not typical of a reaction to collagen, and

-20-

suggesting that Dr. Benavent send the patients' blood samples to

Collagen Corporation to test for the presence of collagen. At the

direction of Dr. Benavent, Gonzalez sent a sample of her blood to

Collagen Corporation. On March 4, 1992, Collagen Corporation wrote

to Dr. Benavent (who passed the letter on to Gonzalez) that

Gonzalez' blood tested negative for the presence of bovine collagen

antibodies. The letter stated that the results were a "research

tool only and should not be considered diagnostic."

After receiving the results from Collagen Corporation,

Dr. Benavent told Gonzalez that he did not think that the material

injected into her face was collagen. He did, however, tell her

that her symptoms might be permanent.

In September 1992, Gonzalez traveled to San Antonio to

meet with Dr. Wilkinson, who told her that the marks on her face

were a reaction to bovine collagen. According to Gonzalez, this

was the first time that she became aware of the permanency and

cause of her injury.

4. Pedreira

The small bumps that appeared on plaintiff Pedreira's

face after her third treatment with Montesinos in September 1989

became "quite noticeable" four to six weeks later, and have

persisted in that state ever since. Although Pedreira did not see

the material being injected, Montesinos told Pedreira that she was

using bovine collagen.

Starting in January or February of 1990, and continuing

over the next two years, Pedreira consulted a number of physicians

-21-

for diagnosis and treatment. These physicians, whom Pedreira told

that she had received injections of what she thought was collagen

in the areas where the bumps appeared, tried various treatment

techniques to no avail. A dermatologist told Pedreira that she

should wait, because if it was collagen, the reaction would "wear

away," and a plastic surgeon stated that there was nothing he could

do to help her. After consulting some of the doctors, Pedreira

went to Montesinos, who told her to massage the affected area, and

to wait because the reaction would "wear away." Pedreira later

testified that in 1990, when she consulted the plastic surgeon, she

did suspect that collagen was the cause of her injury, but that,

based on the physicians' and Montesinos' assurances, she assumed

the marks would eventually go away.

In January 1992, after talking with her friend Gonzalez,

Pedreira went to see Dr. Benavent. In his notes following

consultation with Pedreira, Dr. Benavent stated that Pedreira had

nodules around her nose and mouth that appeared after receiving

injections of what was purportedly collagen from a "beautician."

Like Gonzalez, Pedreira submitted a blood sample to Collagen

Corporation for testing, the results of which were negative for the

presence of collagen. Finally, Pedreira saw Dr. Wilkinson in

September 1989, at which time she asserts she first became aware of

the permanency and cause of her facial deformities.

B. Procedural Background

Plaintiffs filed their separate complaints on August 31,

1993. Their cases were subsequently consolidated. On August 20,

-22-

1996, the district court granted summary judgment for defendant

Collagen Corporation, after concluding that plaintiffs' claims were

barred by Puerto Rico's one-year statute of limitations for tort

actions. Specifically, the district court concluded that, based on

the plaintiffs' own testimony, each plaintiff had reasonable notice

of her injury, "sufficient to file suit" well before they met with

Dr. Wilkinson in September 1992. Based on the district court's

determination that the record indisputably showed that plaintiffs

had sufficient notice of their cause of action, the court held

that:

the one-year statute of limitation for
plaintiffs' causes of action began to run,
at the very latest, in the beginning of
1992. At that time, plaintiffs had
knowledge of their injuries, and of the
entity ("collagen") that caused the tort.
With due diligence, the identity of the
manufacturer of the material injected
could have easily been ascertained by the
plaintiffs. Further, suit could have been
commenced in this court, or at state
court, against Montesinos and a fictitious
named company defendant, to describe the
collagen manufacturer, as allowed under
Puerto Rico law. P.R. Laws Ann. tit. 32,
App. III R15.4 (1983).

935 F. Supp. at 82.

In an order dated December 31, 1996, the district court

granted summary judgment, based on the same findings of fact and

conclusions of law, for defendant Bertha Montesinos, and denied

plaintiffs' motion for reconsideration.

-23-

IV. Application of Standards of Review to the Present Record

As an initial matter, both appellants and appellees argue

that a decision in their favor is required because the other party

is in some way bound to statements made in pleadings.

Appellants argue that appellee Collagen Corporation

cannot succeed in contending that the plaintiffs knew, or at least

had notice, for purposes of applying the law of limitation of tort

actions in Puerto Rico, that the material injected during

treatments by Montesinos was collagen, while at the same time

denying, as a primary defense, that the material injected was

indeed a collagen product of Collagen Corporation. This argument

fails adequately to take into account a procedural provision, in

Federal Rule of Civil Procedure 8(e)(2), that allows parties to

take inconsistent positions in their pleadings. Especially at the

early stages of litigation, a party's pleading will not be treated

as an admission precluding another, inconsistent, pleading. See

Gens v. Resolution Trust Corp., 112 F.3d 569, 573 & n.4 (1st Cir.

1997) (noting the relaxed standard of the Federal Rules that allows

alternative pleadings); Aetna  Cas.  Sur.  Co. v. P&B  Autobody, 43

F.3d 1546, 1555 (1st Cir. 1994) ("Because procedural law allows

alternative contentions, parties to a civil action involving such

an array of factual and legal theories as this case presents may be

allowed to defer choice at least until late stages of proceedings

in the trial court."); McCalden v. California  Library  Ass'n, 955

F.2d 1214 (9th Cir. 1990) (holding that allegations should not be

construed as an admission against inconsistent claims), cert.

-24-

denied, 504 U.S. 957, 112 S. Ct. 2306 (1992);  Molsbergen v.  United

States, 757 F.2d 1016, 1018-19 (9th Cir.) (same),  cert. dismissed ,

473 U.S. 934, 106 S. Ct. 30 (1985).

Likewise, statements contained in plaintiffs' complaints

will not be construed as admissions by plaintiffs that they knew,

before Montesinos administered injections, that Montesinos was

using one of Collagen's products. Collagen argues, unpersuasively,

that statements contained in the plaintiffs' complaints that in

1989 Montesinos injected plaintiffs with "Collagen, a product of

Collagen Corporation," amount to judicial admissions that

plaintiffs knew in 1989 what was being injected into their faces.

The pleading was simply asserting the alleged fact as to what

happened, not as to when plaintiffs learned about that fact.

Turning to the central issues in this appeal, we

conclude that the factual record in this case is sufficiently

developed for this court to determine that the trial court

correctly concluded that the notice component (the objective

component) was established in favor of all defendants against all

plaintiffs as an initial or prima facie matter. We also conclude,

however, that we must nevertheless vacate the judgment for

defendants because a trialworthy dispute of fact exists, on this

record, with respect to the applicability of the recognized

exception to the notice rule as to each plaintiff's claim against

each defendant in this case.

Defendants' argument that plaintiff Rodriguez had

"notice" by early 1992, if not earlier, has support in the record.

-25-

Plaintiff Rodriguez developed hard, red, raised bumps around the

area of injections shortly after Montesinos' treatment in the fall

of 1989. Over the next three years, these bumps did not dissipate

or change in any way. Rodriguez' discussions with Drs. Nevarez and

Borras between 1989 and 1992 show that she was already aware that

a raised ridge was a result of--or at least related to--the

injections she received from Montesinos. By March 1992 (if not

earlier), when Rodriguez discontinued injection treatments with

Montesinos, the intractable nature of Rodriguez' symptoms put her

on notice that she had been injured. By early 1992, enough facts

were available to Rodriguez to enable her to consult a lawyer and,

with the lawyer's help, investigate the manufacturing source of the

material injected by Montesinos into her face. Had she not

received the assurances of Montesinos and encountered the

uncertainty of the doctors, her failure to pursue a claim after two

years of unchanged symptoms would have barred her claim under the

objective rule of notice.

Plaintiff Fernandez developed the reactive bumps, at the

sites of the injections, the evening after receiving her third

treatment from Montesinos. At some time in early 1990, she

consulted with Dr. Latoni. Fernandez told Dr. Latoni at that time

that she had received collagen injections from Montesinos at the

site of the reaction. Dr. Latoni treated Fernandez "nine or ten

times," using kenalog injections and dermabrasion techniques, but

to no avail.

-26-

Defendants contend, with support in the record, that by

the time Fernandez finished treatment with Dr. Latoni (the date is

not apparent from the record, but it was well before her visit to

Dr. Wilkinson), sufficient facts were available to put her on

notice that she had sustained an injury as a result of the

injections administered by Montesinos. That Fernandez was aware of

a possible link between the injections and her facial deformities

is evidenced in her statements to Dr. Latoni, and her discussions

with Montesinos, whom she told about the reaction. When the

symptoms persisted unchanged, even after numerous treatments by

Dr. Latoni, Fernandez was put on notice that the marks on her face

were not a normal reaction to collagen injections that would "wear

away."

Plaintiff Gonzalez had numerous indications, well before

her September 1992 visit to Dr. Wilkinson, that her reaction was a

result of the collagen injections that she received from Montesinos

on October 24, 1989. Montesinos told Gonzalez that she was using

collagen in the injections, and later told her that the reaction

might have been caused by "dead" collagen. Although some of the

doctors told Gonzalez that if it was collagen, the reaction would

go away, the bumps did not disappear for over two years. And at

least one of the doctors, Dr. Carranza, explicitly told Gonzalez

that the reaction was related to her facial injections.

The reaction did not subside over time, despite further

treatments from Montesinos. The fact that Gonzalez continued to

see the unlicensed cosmetologist after being advised by her

-27-

physicians that she should not continue to have injections,

moreover, tends to undermine any claim by Gonzalez that she was not

on notice. Also, as she did with the other doctors that she saw,

Gonzalez told Dr. Benavent in 1990 that she had received what she

believed was collagen injected into her face, and that she had

developed the rash at the same location as the injections. In his

letter to the Collagen Corporation, Dr. Benavent related how

Gonzalez told him that she believed that Montesinos might have

injected collagen that was not properly refrigerated. Gonzalez was

informed of the letter from Collagen stating that her blood tested

negative for collagen antibodies. After receiving these results,

Dr. Benavent told Gonzalez that he did not know what had been

injected into her face. 

Defendants contend, with support in the record, that

Gonzalez was aware, when she consulted with the various doctors

between 1989 and 1991, that her facial deformities were related to

the injection she received in the fall of 1989. She even told

Dr. Benavent that she suspected that the injection that resulted in

her deformities might have contained improperly stored collagen.

The representations of Collagen and Benavent were not enough to

undermine an impression, supported by facts known to Gonzalez at

the time, that she had been injured as a result of the particular

injection administered by Montesinos. We conclude that, as a

matter of law, she was on notice.

Like plaintiff Gonzalez, plaintiff Pedreira consulted

with Dr. Benavent; similarly, she received the results of the blood

-28-

tests and Dr. Benavent's opinion that the reaction was probably not

caused by collagen. For the reasons just discussed, defendants

contend, with support in the record, that Pedreira told the doctors

with whom she consulted that the bumps on her face appeared after

receiving collagen injections into her face, and that the bumps

were located at the sites of the injections. Pedreira admitted

that in late 1990 she suspected the collagen injection as the

culprit in her injury, but that she believed that the symptoms

would just go away. It is true that this belief was based in part

on the representations of Montesinos, with whom she talked in the

summer of 1990, and who told her to massage the bumps, which would

eventually go away. We conclude, nevertheless, that as a matter of

law Pedreira was on notice.

In the present case, each of the plaintiffs had notice

well before September 1992 that her symptoms were related to the

collagen injections administered by Montesinos. Each of the

plaintiffs was told by Montesinos, either before the damaging

injections, or after the plaintiff developed the marks on her face,

that Montesinos had used injectable collagen. All of the

plaintiffs told their doctors that the marks appeared after

receiving the collagen injections, at the same sites as the

injections. Many of the doctors confirmed plaintiffs' suspicions

that the bumps or marks were a result of the collagen injections.

All of plaintiffs received more than one collagen reaction; most

received injections after the one that resulted in the rash. That

the red raised bumps were not a normal, more mild, reaction to

-29-

collagen should have been apparent to plaintiffs, given that they

did not experience a similar reaction to any of the other

injections. 

Even if the plaintiffs were on notice as to the

likelihood of a legal claim springing from their facial

deformities, an arguable question of fact remains as to whether the

representations of Montesinos and others contributed, in a material

way, to plaintiffs' delay in bringing suit. In other words, a

question of material fact remains as to whether the exception to

the notice rule applies in this case. Plaintiffs received repeated

reassurances from Montesinos that the reactions would go away. The

doctors consulted by the plaintiffs gave a wide range of diagnoses

and prognoses, including reassurances that the symptoms would

subside, statements of uncertainty as to the composition of the

injected material, and prescriptions for treatments that

purportedly would remedy the facial marks. The effect of these

representations, although not made by the alleged torfeasors, is a

factor to consider in determining whether plaintiffs reasonably

relied on Montesinos' assurances. 

After full consideration of the factual record before us

in this appeal, we conclude that we cannot say that a finder of

fact, reasoning on the basis of the evidence in the record before

us, could come to only one finding, a finding for the defendants on

the limitation issue on all claims against all defendants. The

evidence in the record in this case is not so one-sided that we can

say that defendants are entitled to a judgment as a matter of law

-30-

that the exception to the notice concept does not apply. It is a

defendant's burden, in moving for summary judgment, to establish

that all material facts are undisputed, and that no finder of fact

could reasonably find a genuine dispute of material fact and

resolve that dispute in the plaintiff's favor. In view of the

relatively particularized nature of evidence favorable to each

plaintiff in this case with respect to reassurances after

suspicions were aroused, in relation to her claim against each

defendant, we cannot say that a finder of fact must find this

evidence not creditworthy.

First. The evidence does not compel a finding, as to any

plaintiff, that she has failed to show by a preponderance of the

evidence that she did not have true knowledge of injury, source of

injury, and awareness of all facts constituting the factual grounds

for legal responsibility of an identifiable actor or supplier of

collagen.

Second. The evidence does not compel a finding, as to

any plaintiff, that she has failed to show by a preponderance of

the evidence that she reasonably relied upon repeated assurances by

Montesinos and others.

For these reasons, even though we have ruled that but for

the second of the foregoing genuine disputes of fact defendants

would have been entitled to summary judgment under the notice rule

(the objective component of the legal test), the judgment for

defendants entered in the trial court must be vacated and the case

must be remanded. We direct, explicitly, that the only limitation-

-31-

of-actions issue remaining for proceedings on remand is the issue

regarding reasonableness of reliance on assurances of the

defendants, evaluated in the context of evidence of assurances by

unaffiliated third parties.

It is so ordered. Costs are awarded to plaintiffs.

-32-