USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-2149 EDNA RODRIGUEZ-SURIS, ET AL., Plaintiffs - Appellants, v. BERTHA MONTESINOS, ET AL., Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Daniel R. Dominguez, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Cyr, Senior Circuit Judge, and Keeton, District Judge. _____________________ Kevin G. Little for appellants. Joe  W.  Redden,  Jr., with whom Curt  Webb, Linda  K.  McCloud, Beck, Redden & Secrest ,  Edna Hernandez and  Reichard & Escalera were on brief for appellees. ____________________ August 11, 1997 ____________________  Of the District of Massachusetts, sitting by designation. KEETON, District  Judge. In this diversity action, plaintiffs-appellants sued defendants-appellees for injuries sustained after receiving facial collagen injections from defendant Bertha Montesinos. Plaintiffs filed their complaint nearly four years after receiving the injurious injections. The district court granted summary judgment in favor of both defendants (Montesinos and Collagen Corporation), holding that all of plaintiffs' claims were barred by the one-year Puerto Rico statute of limitation applicable to tort actions. 935 F. Supp. 71 (D.P.R. 1996). We reverse and remand with directions, as explained. I. Issues Presented The principal legal issues in dispute in this case concern limitation of tort actions under the law of Puerto Rico. More precisely, the dispute centers on the meaning of statutory provisions and opinions of courts of Puerto Rico interpreting them, particularly with respect to levels of awareness of injury, source of injury, causal connection, and legal responsibility. To what extent is the running of the statutory time limit of one year for the filing of tort actions for damages affected by lack of awareness of injury, a connection between injury and the personal services or other conduct of a person, and legal responsibility for the injury? To what extent is the running of the statutory time limit of one year affected by lack of awareness of a connection between -2- injury and a product of a manufacturer or other supplier of the product? To what extent is the running of the limitation period affected by the representations of the person who caused the injury, or of third persons, regarding the nature and source of a plaintiff's injury? Answers to these questions must be determined as matters of law. Accordingly, this court reviews the district court's rulings on these issues de novo. The matters of law we are deciding, of course, are matters of the law of Puerto Rico. Both in the district court and in this court on appeal, the determination of these questions of law does not involve any discretion to fashion rules of law. Instead, our objective is solely to determine what is the law as indicated by authoritative sources. Primary among these "authoritative sources" are the plainly expressed holdings of the highest court of Puerto Rico. See, e.g., Daigle v. Maine  Med. Ctr.,  Inc., 14 F.3d 684, 689 (1st Cir. 1994) (noting that in applying state law, a federal court is "absolutely bound by a current interpretation of that law formulated by the state's highest tribunal"). Where a jurisdiction's highest court has not spoken on a precise issue of law, we look to "analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law" in order to make an "informed prophecy" of -3- how the state court would rule on the precise issue. Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). II. Puerto Rico Law Regarding the Statute of Limitation A. An Overview The Puerto Rico statute of limitation for tort actions provides for a one-year limitation period that begins to run from "the time the aggrieved person has knowledge of the injury." P.R. Laws Ann. tit. 31, S 5298 (1994). Plaintiff bears the burden of proving when the "damage" became known. Rivera  Encarnacion v. Comm. of Puerto Rico , 113 P.R. Dec. 383, 385, 13 P.R. Offic. Trans. 498, 501 (1982). What is it that one must know in order to have "knowledge of the injury?" The Supreme Court of Puerto Rico has stated that a plaintiff will be deemed to have "knowledge" of the injury, for purposes of the statute of limitation, when she has "notice of the injury, plus notice of the person who caused it." Colon Prieto v. Geigel, 115 P.R. Dec. 232, __ (1984), 15 P.R. Offic. Trans. 313, 330 [citations hereafter to P.R. Offic. Trans.]. See also  Fragoso v. Lopez, 991 F.2d 878, 886 (1st Cir. 1993); Santiago  Hodge v. Parke Davis & Co. , 909 F.2d 628, 632 (1st Cir. 1990);  Barretto Peat v. Luis  Ayala  Colon  Sucrs., 896 F.2d 656, 658 (1st Cir. 1990); Hodge v. Parke Davis & Co., 833 F.2d 6, 7 (1st Cir. 1987). "Notice of the injury," as explained in a later case, is established by proof of: some outward or physical signs through which the aggrieved party may become aware -4- and realize that he [or she] has suffered an injurious aftereffect, which when known becomes a damage even if at the time its full scope and extent cannot be weighed. These circumstances need not be known in order to argue that the damage has become known, because its scope, extent and weight may be established later on during the prosecution of the remedial action. Delgado Rodriguez v.  Nazario de Ferrer , No. CE-86-417, slip op. at 10 (Official English Translation) (P.R. May 16, 1988) (quoting H. Brau del Toro,  Los Danos y Perjuicios Extracontractuales en Puerto Rico 639-40, Pub. J.T.S., Inc. (2d ed. 1986)) (internal quotation marks omitted). Once a plaintiff is on "notice of the injury," the plaintiff may "not wait for his [or her] injury to reach its final degree of development and postpone the running of the period of limitation according to his [or her] subjective appraisal and judgment." Ortiz v. Municipality of Orocovis, 113 P.R. Dec. 484, 487, 13 P.R. Offic. Trans. 619, 622 (1982). In some circumstances, awareness of the existence of an injury, on its own, will not be enough to trigger the running of the limitation period. See,  e.g.,  Galarza v.  Zagury, 739 F.2d 20, 24 (1st Cir. 1984) (stating that "knowledge of the author of the harm means more than an awareness of some ill effects resulting from an operation by a particular doctor"). If a plaintiff is not aware of some level of reasonable likelihood of legal liability on the part of the person or entity that caused the injury, the statute of limitation will be tolled. In other words, a plaintiff must also have "knowledge of the author of the injury," a concept -5- articulated at length in the Supreme Court of Puerto Rico's decision in Colon Prieto.  In Colon  Prieto, the plaintiff experienced pain and insensitivity in his tongue following dental surgery in November 1971. 15 P.R. Offic. Trans. at 317. Geigel, the dental surgeon, told plaintiff that he had bitten himself on the tongue and that the symptoms would subside in a short while.  Id. For over a year, Colon Prieto continued to see Geigel, who told him that the pain would go away. Id. But the symptoms did not subside. In November 1972, plaintiff consulted with another physician, and learned for the first time that the pain was the result of Geigel's having cut a nerve during the initial operation. Colon Prieto brought suit against Geigel on September 10, 1973, more than one year after the original operation. Geigel asserted the statute of limitation as a defense. The Supreme Court of Puerto Rico rejected Geigel's defense, holding that, because Colon Prieto did not acquire knowledge of the nature of his injury and Geigel's role in the injury until the November 1972 consultation with the other doctor, plaintiff was not barred under the Puerto Rico statute of limitation. Distinguishing Colon Prieto's case from the more traditional tort case in which a plaintiff is aware from the moment of the tortious act of the injury and its cause (for example, where a defendant's act causes something to fall on a plaintiff immediately), the Supreme Court of Puerto Rico observed that the statutory phrase "' from the time the aggrieved person had knowledge -6- thereof' ... rejects a literal and narrow reading." Id. at 327. The court noted that the legal reasoning behind a plaintiff's loss of rights under a statute of limitation is that the plaintiff is deemed to have abandoned those rights. Id. (quoting A. Borrell Macia,  Responsabilidades Derivadas de Culpa Extracontractual Civil , 66, Barcelona, Ed. Bosch (2d ed. 1958)). In order for this legal reasoning to apply, therefore, "such abandonment [on the part of the plaintiff] should really exist." Id. B. Three Analytically Separable Questions We conclude that within the larger structure regarding the law of Puerto Rico on limitation of tort actions are three analytically separable subsidiary issues. These issues concern the circumstances in which a plaintiff can be said to have, or to lack, the requisite level of awareness for statute of limitation purposes. First, the concept of "true knowledge" applies where a plaintiff is actually aware of all the necessary facts and the existence of a likelihood of a legal cause of action. Second, concepts of "notice" and "deemed knowledge" apply. Under these concepts a plaintiff's subjective awareness is measured against the level of awareness that the plaintiff, having been put on notice as to certain facts and having exercised reasonable care regarding a potential claim, should have acquired. Third, the law or Puerto Rico recognizes an exception to applicability of the concepts of notice and deemed knowledge for circumstances in which a -7- plaintiff's failure to make a timely filing of a claim is reasonably based upon the assurances of the person who caused the injury. From a structural perspective, two of these questions (about true knowledge and deemed knowledge) concern alternative ways in which a defendant may establish that a claim is barred because it is filed too late. If the defendant succeeds in showing that plaintiff has not satisfied, or cannot satisfy, plaintiff's burden of proving lack of true knowledge (that is, lack of full awareness of all that need be known to preclude tolling), final judgment for the defendant on the ground of late filing is appropriate. If, instead, the finder of fact finds (or the court, by determining that the evidence of record is so one-sided as to compel a finding) that the plaintiff was aware of enough facts to constitute notice and to satisfy the deemed knowledge rule of the Puerto Rico law of limitation of tort actions, final judgment for the defendant on the ground of late filing is appropriate unless plaintiff has proffered evidence sufficient to support a finding that representations and assurances by the defendant persuaded plaintiff to rely reasonably and delay institution of a civil action. The "unless" clause in the next preceding sentence may be treated either as a condition to be satisfied before the deemed knowledge rule applies, or as a negation of an otherwise adequate showing of applicability of the deemed knowledge rule. Under -8- either analytic treatment of the substantive requirement of the legal test for deemed knowledge, this substantive requirement is the third of the analytically separable issues to which we referred above. It creates another possibility of a plaintiff's showing that a genuine dispute of material fact precludes a judgment as a matter of law for the defendant on the limitation ground. 1. Full Awareness:  A Subjective Component of the Legal Test In circumstances where a plaintiff has not abandoned a cause of action, but instead was never aware that such a cause of action existed, the statute of limitation would not operate as a bar to the exercise of the plaintiff's legal rights. See Colon Prieto, 15 P.R. Offic. Trans. at 327-328. As the court noted in Colon  Prieto, a plaintiff who is not aware of the existence of a cause of action is essentially incapable of bringing suit within the limitation period. Id. at 327. The emphasis on the plaintiff's "subjective" ability to bring suit is justified, at least in part, by the brevity of the limitation period. Id. at 328. Reasoning from these premises, the Supreme Court of Puerto Rico held that, in order for the limitation period to start to run, a plaintiff must be able to institute suit, which requires knowledge of the existence of an injury and knowledge of the person who caused the injury. Knowledge of who caused the injury, the court held, was necessary so that the plaintiff would know whom to sue. Id. at 330 (quoting I A. Barrell y Soler, Derecho  Civil Espanol 500, Barcelona, Ed. Bosch (1955)).  -9- In setting forth this standard, the court in  Colon Prieto stated that it was adopting a "subjective" standard. Id. at 328. In the law of Puerto Rico, a legal test of this kind is sometimes referred to as grounded in the "cognitive" theory of damages.  See, e.g., Barretto Peat, 896 F.2d at 657 (describing S 5298 of Puerto Rico's Civil Code as codifying the cognitive theory). To understand this component of the applicable legal test, for the purpose of applying it to the case now before us, we must understand what level of awareness is required as to particulars of the injury and its source. Was the source in personal services, or in some other form of conduct of some identifiable person, or in a product used or supplied by some person and obtained through a chain of distribution involving one or more others, including a manufacturer? Under the law of Puerto Rico, the plaintiff's level of awareness about these matters may be relevant in more than a single way, bearing upon more than a single sub-issue. First. What effect is to be given to evidence, if creditworthy, of the effect that post-injury conduct of a person who was a cause of the injury, or post-injury conduct of other persons, had on plaintiff's refraining from or delaying instituting suit? Second. What more would the plaintiff have learned about the injury and authorship of the injury if the plaintiff, having notice in the sense of awareness of some facts, had then made the inquiries that a careful person would have made? -10- 2. Notice and Deemed Knowledge:  The Objective Component We understand the court in Colon  Prieto to have been speaking quite explicitly to the second of these two questions (stated immediately above) in the passage of the opinion noting that, if a plaintiff's ignorance of an injury and its origin was due to the plaintiff's own negligence or lack of care, then the statute of limitation would not be tolled. See Colon  Prieto, 15 P.R. Offic. Trans. at 327-29 (quoting A. Borrell Macia, Responsabilidades Derivadas de Culpa Extracontractual Civil 344-345 (Bosch ed. 2d ed. 1958)). This point is associated with the level of awareness implicit in the concept of notice.  The law of Puerto Rico treats a person as being aware of all that, having awareness constituting notice, that person would have been likely to come to know through the exercise of care. Thus, we understand the holdings of Puerto Rico decisions to mean that "actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired." Villarini-Garcia v. Hospital del Maestro, Inc., 8 F.3d 81, 84 (1st Cir. 1993). It follows, then, that to determine the point at which a plaintiff should be held responsible for the required level of awareness of whether another particular person was an author of the injury, a court looks to "whether plaintiff knew or with the degree of diligence required by law would have known whom to sue."  Kaiser v. Armstrong  World  Indus., 872 F.2d 512, 516 (1st Cir. 1989) (citations and internal quotation omitted).  -11- Once a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run. See, e.g., Villarini, 8 F.3d at 85. In Villarini, a plaintiff was made aware of facts sufficient for her to be able to file suit (as to two of her claims) three weeks after her operation. We held that the plaintiff was time-barred from bringing those claims roughly two and a half years later. Id. We recognized in Villarini that the plaintiff may not have understood fully the legal significance of the facts known to her after her operation, but also recognized that the meaning of authoritative declarations of the law of Puerto Rico is that "there is nothing unfair in a policy that insists that the plaintiff promptly assert her rights." Id. Thus, plaintiff's failure to consult with a lawyer or otherwise investigate the claim to which she had been alerted by the factual circumstances associated with the operation barred her from commencing that claim in the courts over one year after being on notice. Id. Similarly, once a plaintiff is put on notice that someone or some entity is the cause of the injury, the plaintiff may not succeed in a late-filed claim by asserting ignorance about the precise identity of the tortfeasor. Also, because corporate identities and intracorporate relationships are a matter of public record, knowledge of the precise corporate identity of the entity responsible for a plaintiff's injury is not required before the -12- period prescribed by the statute of limitation begins to run. See Hodge v. Parke Davis & Co., 833 F.2d 6, 7-8 (1st Cir. 1987). 3. An Exception to the Rule of Notice An exception to the rule of notice (the objective component of the law of limitation of tort actions) is recognized. If a plaintiff's suspicions that she may have been the victim of a tort are assuaged by assurances made by the person who caused the injury, a plaintiff will not be held responsible for failing to pursue her claim more aggressively. Colon Prieto, 15 P.R. Offic. Trans. at 329-330. In addition to holdings discussed above (in explanation of both the subjective and the objective components of the law of Puerto Rico), the court in Colon  Prieto held that, where the plaintiff's doctor (the person responsible for causing the injury) assured the plaintiff that the pain was normal and was due to plaintiff's biting his tongue during the operation, the plaintiff would not be held to have "known" of the injury and the cause until the later consultation. This ruling, the court observed, was the fairest and most equitable. We safeguard the aggrieved party's right to seek redress, while we abstain from rewarding the person who, having caused the damage, took refuge in his patient's trust and ignorance trying to avail himself of the circumstances in order to defeat the action. Id. at 330.  In this context, where a diligent plaintiff reasonably relies upon representations made by a tortfeasor that her symptoms are not the result of a negligent or otherwise tortious act, that -13- plaintiff is not barred, because of her "own negligence or lack of care," from the benefit of tolling of the limitation period. See Colon  Prieto, 15 P.R. Offic. Trans. at 329-330. See  also Villarini, 8 F.3d at 85-86. Stated another way, the condition attached to a plaintiff's right of tolling -- the condition that she act with care to make additional inquiries once she is on notice -- does not apply (or is excused, or negated) when the plaintiff reasonably relies on what others told her. The reliance, however, must be reasonable, and the determination of the reasonableness of a plaintiff's reliance on the assurances of others involves an evaluation that, depending upon the circumstances, may or may not be a question for the finder of fact, and thus may or may not preclude summary judgment. See  id. at 86- 87. Where facts sufficient to support every element of a claim relating to an injury are apparent to a plaintiff at an earlier time, it will not be reasonable for the plaintiff to rely on assurances of a tortfeasor and fail to pursue the claim. See id. at 86 (where plaintiff had all the information necessary for a failure-to-warn claim, doctor's subsequent reassurances would not excuse plaintiff's lack of diligence in pursuing the claim). Our holdings, moreover, support the conclusion that a time will come at which, if the tortfeasor's initial predictions are not borne out, a plaintiff's reliance is no longer reasonable. Id. Finally, representations made by third-party doctors constitute another factor to consider in determining whether a plaintiff's continued -14- reliance upon the reassurances of a tortfeasor is reasonable. See Villarini, 8 F.3d at 86 (holding that varying diagnoses of different doctors, along with the reassurances of the negligent physician, "could have lulled a reasonable person into believing for a year or more that the operation had not been botched").  C. Summary In sum, we conclude (1) that within the larger questions regarding the law of Puerto Rico on limitation of tort actions are three analytically separable subsidiary questions; (2) that from a structural perspective, two of these questions (about true knowledge and deemed knowledge) concern alternative ways a defendant may establish that a claim is barred because filed too late; (3) that, if on the evidence proffered in a case, a finder of fact might reasonably find that representations and assurances persuaded plaintiff to rely reasonably and delay institution of a civil action, summary judgment for defendants would be inappropriate; and (4) that this remains true even if the record would otherwise require judgment for defendant under the rule of notice and deemed knowledge. III. Record for Review A. Factual Background Collagen is a natural protein found throughout the body that provides support to other bodily tissues, including the skin. Since the 1970s, collagen obtained from animals has been used in a -15- variety of medical procedures, including procedures designed to improve the consistency and appearance of the skin. Defendant Collagen Corporation manufactures and distributes at least two types of bovine collagen (derived from cows), called Zyderm and Zyplast. Both can be injected under the skin to improve the appearance and structure of the skin. Collagen's products are distributed only to be sold to and administered by licensed physicians. In 1989, each of the plaintiffs, Edna Rodriguez-Suris ("Rodriguez"), Maria Rosa Gonzalez San Juan de Cortes ("Gonzalez"), Annette Perez de Pedreira ("Pedreira"), and Vanessa Perez de Fernandez ("Fernandez"), received collagen injections from defendant Bertha Montesinos. Montesinos, who was not a licensed physician, obtained injectable collagen from a doctor in Miami, Florida, and administered the injections at her apartment in Santurce, Puerto Rico. In each instance, Montesinos injected collagen into the forehead (between the eyebrows) and along the "expression lines" surrounding the nose and lips of each of the plaintiffs. None of the plaintiffs saw the material that was injected. In some instances, Montesinos provided the plaintiff with a brochure describing cosmetic collagen treatments, but none of the plaintiffs saw Collagen Corporation product packaging or inserts. In the fall of 1989, Montesinos gave each of the plaintiffs a treatment involving injections. Shortly thereafter, each plaintiff developed hard red nodules or bumps at the sites of the injections. -16- In the following summary of the evidence of record with respect to each plaintiff's history of treatment and consequences, we state the evidence as a finder of fact might find by a preponderance of the evidence, where any genuine dispute exists, since our purpose is to determine whether summary judgment for defendants is appropriate. 1. Rodriguez Plaintiff Rodriguez went to Montesinos for injections for the third time in November 1989. Immediately after the treatment, Rodriguez developed a redness, accompanied by a burning sensation, around the area of the injections. Although the burning sensation subsided within a week, Rodriguez was left with a "red, raised ridge" on both sides of her nose and mouth. Over the next two and a half years, Rodriguez received three to four more collagen injections from Montesinos, who assured her that the marks would gradually go away. The ridge, however, remained hard and did not diminish in size. Rodriguez last saw Montesinos in March 1992. Rodriguez spoke informally with two doctors about her problem. In late November 1989, Rodriguez talked with Dr. Robert Nevarez, a plastic surgeon, during a party they were both attending. Rodriguez told Dr. Nevarez that she had received collagen injections and that the red marks were a reaction to the injections. Dr. Nevarez said that he thought that the marks were an adverse reaction to collagen, but that they would go away. Nevarez told Rodriguez to come to his office for a consultation, but the plaintiff never followed up. At another social event some -17- time between 1989 and 1992, but closer to 1989, Rodriguez talked with Dr. Pedro Borras, a neurosurgeon, who told her that if the marks were a reaction to collagen, then they would go away.  In September 1992, Rodriguez went to see Dr. Tolbert Wilkinson in San Antonio, Texas, at which time, according to Rodriguez, she first learned that the marks had been caused by products of defendant Collagen Corporation and would be permanent. 2. Fernandez Plaintiff Fernandez, sister of plaintiff Pedreira, received her third collagen injection treatment from Montesinos in October 1989. Fernandez did not see what was injected into her face. The evening after her third treatment, Fernandez noticed "slightly raised and red" marks in the places where she had been injected. When the marks did not disappear as she expected, Fernandez went to see Dr. David Latoni-Cabanillas, a dermatologist, in early 1990. Fernandez told Dr. Latoni that she received collagen injections from Montesinos in the areas where she developed the marks. Dr. Latoni said that the marks looked "strange" to him, and that he did not know if they would go away. Dr. Latoni attempted to treat Fernandez' symptoms with various techniques, including injections of other material and dermabrasion. His attempts to remedy her symptoms were unsuccessful. Fernandez also had a discussion with Montesinos, who told plaintiff that the marks would go away.  In September 1992, Fernandez consulted with Dr. Wilkinson in San Antonio. Fernandez claims that she was not aware of the -18- source and extent of her injuries until the meeting with Dr. Wilkinson. 3. Gonzalez Plaintiff Gonzalez received two treatments from Montesinos in 1989 and two or three in 1990 or 1991. Gonzalez did not see the material injected into her face, or any packaging, but Montesinos told her that it was "animal collagen." Gonzalez received her second series of collagen injections on October 24, 1989. The day after this second series, Gonzalez developed a rash- like reaction at the sites of the injections.  A few months after the development of the rash, Gonzalez consulted Dr. Isabel Banuchi, a dermatologist who administered collagen injections as part of her practice. Dr. Banuchi expressed concern after hearing that Gonzalez had received injections from an unlicensed person. Dr. Banuchi told Gonzalez that she did not know whether the material that had been injected was in fact collagen, and that she had never seen the type of reaction to collagen that Gonzalez was experiencing. Gonzalez also consulted with two other doctors between 1990 and 1992: Dr. Carranza, who told her that she should wait and see what happened with the reaction, and Dr. Armando Silva, a dermatologist who said he did not know what had been injected into Gonzalez' face. According to Gonzalez, although she informed all of these doctors that she developed the symptoms immediately after being injected by what she was told was collagen, the physicians said that her reaction seemed "strange" to them, because reactions -19- to collagen injections normally disappear. Dr. Carranza, however, did tell Gonzalez that her rash was a result of whatever had been injected into her face. Despite directions from the physicians with whom she consulted not to have any more injections, Gonzalez received more treatments from Montesinos two or three times after developing the rash, in 1990 or 1991. Montesinos administered injections at the site of the hard nodules because, she told Gonzalez, the reaction might have been the result of "dead" collagen, and further injections could help improve the condition of her facial skin. Gonzalez also sought diagnosis and treatment from Dr. Walter Benavent. On December 26, 1990, Dr. Benavent wrote to a scientist at Collagen Corporation asking for assistance in diagnosing one of his patients (Gonzalez) who had developed "hardened nodules along both naso-labial folds, corner of the mouth, and chin following injections of Collagen" some time in September or October of 1989. According to Dr. Benavent, Gonzalez stated that the person who administered the injections told her it was collagen, but that Gonzalez suspected that the collagen might not have been properly refrigerated because of power outages in Puerto Rico following Hurricane Hugo.  Over a year later, in January 1992, Dr. Benavent received a letter from Collagen Corporation stating that it was difficult to determine whether his patients (by this time, Gonzalez and Pedreira) had in fact been injected with collagen, because their described symptoms were not typical of a reaction to collagen, and -20- suggesting that Dr. Benavent send the patients' blood samples to Collagen Corporation to test for the presence of collagen. At the direction of Dr. Benavent, Gonzalez sent a sample of her blood to Collagen Corporation. On March 4, 1992, Collagen Corporation wrote to Dr. Benavent (who passed the letter on to Gonzalez) that Gonzalez' blood tested negative for the presence of bovine collagen antibodies. The letter stated that the results were a "research tool only and should not be considered diagnostic." After receiving the results from Collagen Corporation, Dr. Benavent told Gonzalez that he did not think that the material injected into her face was collagen. He did, however, tell her that her symptoms might be permanent. In September 1992, Gonzalez traveled to San Antonio to meet with Dr. Wilkinson, who told her that the marks on her face were a reaction to bovine collagen. According to Gonzalez, this was the first time that she became aware of the permanency and cause of her injury. 4. Pedreira The small bumps that appeared on plaintiff Pedreira's face after her third treatment with Montesinos in September 1989 became "quite noticeable" four to six weeks later, and have persisted in that state ever since. Although Pedreira did not see the material being injected, Montesinos told Pedreira that she was using bovine collagen. Starting in January or February of 1990, and continuing over the next two years, Pedreira consulted a number of physicians -21- for diagnosis and treatment. These physicians, whom Pedreira told that she had received injections of what she thought was collagen in the areas where the bumps appeared, tried various treatment techniques to no avail. A dermatologist told Pedreira that she should wait, because if it was collagen, the reaction would "wear away," and a plastic surgeon stated that there was nothing he could do to help her. After consulting some of the doctors, Pedreira went to Montesinos, who told her to massage the affected area, and to wait because the reaction would "wear away." Pedreira later testified that in 1990, when she consulted the plastic surgeon, she did suspect that collagen was the cause of her injury, but that, based on the physicians' and Montesinos' assurances, she assumed the marks would eventually go away. In January 1992, after talking with her friend Gonzalez, Pedreira went to see Dr. Benavent. In his notes following consultation with Pedreira, Dr. Benavent stated that Pedreira had nodules around her nose and mouth that appeared after receiving injections of what was purportedly collagen from a "beautician." Like Gonzalez, Pedreira submitted a blood sample to Collagen Corporation for testing, the results of which were negative for the presence of collagen. Finally, Pedreira saw Dr. Wilkinson in September 1989, at which time she asserts she first became aware of the permanency and cause of her facial deformities. B. Procedural Background Plaintiffs filed their separate complaints on August 31, 1993. Their cases were subsequently consolidated. On August 20, -22- 1996, the district court granted summary judgment for defendant Collagen Corporation, after concluding that plaintiffs' claims were barred by Puerto Rico's one-year statute of limitations for tort actions. Specifically, the district court concluded that, based on the plaintiffs' own testimony, each plaintiff had reasonable notice of her injury, "sufficient to file suit" well before they met with Dr. Wilkinson in September 1992. Based on the district court's determination that the record indisputably showed that plaintiffs had sufficient notice of their cause of action, the court held that: the one-year statute of limitation for plaintiffs' causes of action began to run, at the very latest, in the beginning of 1992. At that time, plaintiffs had knowledge of their injuries, and of the entity ("collagen") that caused the tort. With due diligence, the identity of the manufacturer of the material injected could have easily been ascertained by the plaintiffs. Further, suit could have been commenced in this court, or at state court, against Montesinos and a fictitious named company defendant, to describe the collagen manufacturer, as allowed under Puerto Rico law. P.R. Laws Ann. tit. 32, App. III R15.4 (1983). 935 F. Supp. at 82. In an order dated December 31, 1996, the district court granted summary judgment, based on the same findings of fact and conclusions of law, for defendant Bertha Montesinos, and denied plaintiffs' motion for reconsideration. -23- IV. Application of Standards of Review to the Present Record As an initial matter, both appellants and appellees argue that a decision in their favor is required because the other party is in some way bound to statements made in pleadings. Appellants argue that appellee Collagen Corporation cannot succeed in contending that the plaintiffs knew, or at least had notice, for purposes of applying the law of limitation of tort actions in Puerto Rico, that the material injected during treatments by Montesinos was collagen, while at the same time denying, as a primary defense, that the material injected was indeed a collagen product of Collagen Corporation. This argument fails adequately to take into account a procedural provision, in Federal Rule of Civil Procedure 8(e)(2), that allows parties to take inconsistent positions in their pleadings. Especially at the early stages of litigation, a party's pleading will not be treated as an admission precluding another, inconsistent, pleading. See Gens v. Resolution Trust Corp., 112 F.3d 569, 573 & n.4 (1st Cir. 1997) (noting the relaxed standard of the Federal Rules that allows alternative pleadings); Aetna  Cas.  Sur.  Co. v. P&B  Autobody, 43 F.3d 1546, 1555 (1st Cir. 1994) ("Because procedural law allows alternative contentions, parties to a civil action involving such an array of factual and legal theories as this case presents may be allowed to defer choice at least until late stages of proceedings in the trial court."); McCalden v. California  Library  Ass'n, 955 F.2d 1214 (9th Cir. 1990) (holding that allegations should not be construed as an admission against inconsistent claims), cert. -24- denied, 504 U.S. 957, 112 S. Ct. 2306 (1992);  Molsbergen v.  United States, 757 F.2d 1016, 1018-19 (9th Cir.) (same),  cert. dismissed , 473 U.S. 934, 106 S. Ct. 30 (1985). Likewise, statements contained in plaintiffs' complaints will not be construed as admissions by plaintiffs that they knew, before Montesinos administered injections, that Montesinos was using one of Collagen's products. Collagen argues, unpersuasively, that statements contained in the plaintiffs' complaints that in 1989 Montesinos injected plaintiffs with "Collagen, a product of Collagen Corporation," amount to judicial admissions that plaintiffs knew in 1989 what was being injected into their faces. The pleading was simply asserting the alleged fact as to what happened, not as to when plaintiffs learned about that fact. Turning to the central issues in this appeal, we conclude that the factual record in this case is sufficiently developed for this court to determine that the trial court correctly concluded that the notice component (the objective component) was established in favor of all defendants against all plaintiffs as an initial or prima facie matter. We also conclude, however, that we must nevertheless vacate the judgment for defendants because a trialworthy dispute of fact exists, on this record, with respect to the applicability of the recognized exception to the notice rule as to each plaintiff's claim against each defendant in this case. Defendants' argument that plaintiff Rodriguez had "notice" by early 1992, if not earlier, has support in the record. -25- Plaintiff Rodriguez developed hard, red, raised bumps around the area of injections shortly after Montesinos' treatment in the fall of 1989. Over the next three years, these bumps did not dissipate or change in any way. Rodriguez' discussions with Drs. Nevarez and Borras between 1989 and 1992 show that she was already aware that a raised ridge was a result of--or at least related to--the injections she received from Montesinos. By March 1992 (if not earlier), when Rodriguez discontinued injection treatments with Montesinos, the intractable nature of Rodriguez' symptoms put her on notice that she had been injured. By early 1992, enough facts were available to Rodriguez to enable her to consult a lawyer and, with the lawyer's help, investigate the manufacturing source of the material injected by Montesinos into her face. Had she not received the assurances of Montesinos and encountered the uncertainty of the doctors, her failure to pursue a claim after two years of unchanged symptoms would have barred her claim under the objective rule of notice. Plaintiff Fernandez developed the reactive bumps, at the sites of the injections, the evening after receiving her third treatment from Montesinos. At some time in early 1990, she consulted with Dr. Latoni. Fernandez told Dr. Latoni at that time that she had received collagen injections from Montesinos at the site of the reaction. Dr. Latoni treated Fernandez "nine or ten times," using kenalog injections and dermabrasion techniques, but to no avail. -26- Defendants contend, with support in the record, that by the time Fernandez finished treatment with Dr. Latoni (the date is not apparent from the record, but it was well before her visit to Dr. Wilkinson), sufficient facts were available to put her on notice that she had sustained an injury as a result of the injections administered by Montesinos. That Fernandez was aware of a possible link between the injections and her facial deformities is evidenced in her statements to Dr. Latoni, and her discussions with Montesinos, whom she told about the reaction. When the symptoms persisted unchanged, even after numerous treatments by Dr. Latoni, Fernandez was put on notice that the marks on her face were not a normal reaction to collagen injections that would "wear away." Plaintiff Gonzalez had numerous indications, well before her September 1992 visit to Dr. Wilkinson, that her reaction was a result of the collagen injections that she received from Montesinos on October 24, 1989. Montesinos told Gonzalez that she was using collagen in the injections, and later told her that the reaction might have been caused by "dead" collagen. Although some of the doctors told Gonzalez that if it was collagen, the reaction would go away, the bumps did not disappear for over two years. And at least one of the doctors, Dr. Carranza, explicitly told Gonzalez that the reaction was related to her facial injections. The reaction did not subside over time, despite further treatments from Montesinos. The fact that Gonzalez continued to see the unlicensed cosmetologist after being advised by her -27- physicians that she should not continue to have injections, moreover, tends to undermine any claim by Gonzalez that she was not on notice. Also, as she did with the other doctors that she saw, Gonzalez told Dr. Benavent in 1990 that she had received what she believed was collagen injected into her face, and that she had developed the rash at the same location as the injections. In his letter to the Collagen Corporation, Dr. Benavent related how Gonzalez told him that she believed that Montesinos might have injected collagen that was not properly refrigerated. Gonzalez was informed of the letter from Collagen stating that her blood tested negative for collagen antibodies. After receiving these results, Dr. Benavent told Gonzalez that he did not know what had been injected into her face.  Defendants contend, with support in the record, that Gonzalez was aware, when she consulted with the various doctors between 1989 and 1991, that her facial deformities were related to the injection she received in the fall of 1989. She even told Dr. Benavent that she suspected that the injection that resulted in her deformities might have contained improperly stored collagen. The representations of Collagen and Benavent were not enough to undermine an impression, supported by facts known to Gonzalez at the time, that she had been injured as a result of the particular injection administered by Montesinos. We conclude that, as a matter of law, she was on notice. Like plaintiff Gonzalez, plaintiff Pedreira consulted with Dr. Benavent; similarly, she received the results of the blood -28- tests and Dr. Benavent's opinion that the reaction was probably not caused by collagen. For the reasons just discussed, defendants contend, with support in the record, that Pedreira told the doctors with whom she consulted that the bumps on her face appeared after receiving collagen injections into her face, and that the bumps were located at the sites of the injections. Pedreira admitted that in late 1990 she suspected the collagen injection as the culprit in her injury, but that she believed that the symptoms would just go away. It is true that this belief was based in part on the representations of Montesinos, with whom she talked in the summer of 1990, and who told her to massage the bumps, which would eventually go away. We conclude, nevertheless, that as a matter of law Pedreira was on notice. In the present case, each of the plaintiffs had notice well before September 1992 that her symptoms were related to the collagen injections administered by Montesinos. Each of the plaintiffs was told by Montesinos, either before the damaging injections, or after the plaintiff developed the marks on her face, that Montesinos had used injectable collagen. All of the plaintiffs told their doctors that the marks appeared after receiving the collagen injections, at the same sites as the injections. Many of the doctors confirmed plaintiffs' suspicions that the bumps or marks were a result of the collagen injections. All of plaintiffs received more than one collagen reaction; most received injections after the one that resulted in the rash. That the red raised bumps were not a normal, more mild, reaction to -29- collagen should have been apparent to plaintiffs, given that they did not experience a similar reaction to any of the other injections.  Even if the plaintiffs were on notice as to the likelihood of a legal claim springing from their facial deformities, an arguable question of fact remains as to whether the representations of Montesinos and others contributed, in a material way, to plaintiffs' delay in bringing suit. In other words, a question of material fact remains as to whether the exception to the notice rule applies in this case. Plaintiffs received repeated reassurances from Montesinos that the reactions would go away. The doctors consulted by the plaintiffs gave a wide range of diagnoses and prognoses, including reassurances that the symptoms would subside, statements of uncertainty as to the composition of the injected material, and prescriptions for treatments that purportedly would remedy the facial marks. The effect of these representations, although not made by the alleged torfeasors, is a factor to consider in determining whether plaintiffs reasonably relied on Montesinos' assurances.  After full consideration of the factual record before us in this appeal, we conclude that we cannot say that a finder of fact, reasoning on the basis of the evidence in the record before us, could come to only one finding, a finding for the defendants on the limitation issue on all claims against all defendants. The evidence in the record in this case is not so one-sided that we can say that defendants are entitled to a judgment as a matter of law -30- that the exception to the notice concept does not apply. It is a defendant's burden, in moving for summary judgment, to establish that all material facts are undisputed, and that no finder of fact could reasonably find a genuine dispute of material fact and resolve that dispute in the plaintiff's favor. In view of the relatively particularized nature of evidence favorable to each plaintiff in this case with respect to reassurances after suspicions were aroused, in relation to her claim against each defendant, we cannot say that a finder of fact must find this evidence not creditworthy. First. The evidence does not compel a finding, as to any plaintiff, that she has failed to show by a preponderance of the evidence that she did not have true knowledge of injury, source of injury, and awareness of all facts constituting the factual grounds for legal responsibility of an identifiable actor or supplier of collagen. Second. The evidence does not compel a finding, as to any plaintiff, that she has failed to show by a preponderance of the evidence that she reasonably relied upon repeated assurances by Montesinos and others. For these reasons, even though we have ruled that but for the second of the foregoing genuine disputes of fact defendants would have been entitled to summary judgment under the notice rule (the objective component of the legal test), the judgment for defendants entered in the trial court must be vacated and the case must be remanded. We direct, explicitly, that the only limitation- -31- of-actions issue remaining for proceedings on remand is the issue regarding reasonableness of reliance on assurances of the defendants, evaluated in the context of evidence of assurances by unaffiliated third parties. It is so ordered. Costs are awarded to plaintiffs. -32-